May it please the court, I am Joshua Glellen appearing on behalf of Cheryl Peru, who is the claimant in this case under the Longshore and Harbor Workers Compensation Act. The director of the OWCP has not filed a brief or taken any position whatsoever in this case, so the question is one for de novo statutory construction by this court. Well, that raises a curious issue. What is the standard of review? We get into this respect thing, and I'm not quite sure what that means. Can you help us any more? I mean, ordinarily, I'm used to giving great deference, and all of a sudden we're told, well, this is de novo, but we give great respect to something. Well, I think even the great respect principle has no basis any longer. And as set forth in our opening brief, it derives from a statement by the court in a case in which the director took a position which was precisely aligned with that of the board before the Supreme Court pointed out that the board is not an agency within the meaning of the principle that affords judicial deference to agency constructions of the statutes they're charged with administering. The board has no administrative responsibilities whatsoever. It is exclusively a quasi-judicial appellate body. And the director of WCP is the delegate for all purposes of the secretary's administrative authority and regulatory authority under the statute. The board makes its own regulations for its rules of practice but cannot issue regulations on anything else, and certainly not interpretive regulations under the statute's terms other than those pertaining to the board's jurisdiction. So this is a pure question of law that we're looking at? It is indeed. So that would be ordinarily de novo review? It would indeed be. And even the limited respect principle to the board, I think, boils down to the board's... We reiterated that as late as 2004 in the Ninth Circuit, I think, did we not? You have, but not in a situation where it made any difference, Your Honor. It was simply... Dicta. It was dicta, and in fact, any time the board... Excuse me. Any time the director's position is aligned with the board's, then it's a distinction without a difference. But the director has taken no position at all on this issue of statutory construction, even the implementing reg, although it does flesh out some of the other exclusions in Section 23B, which we're here concerned with. The reg says nothing whatsoever about the meaning of retail outlet, which is the determinative phrase here. Yeah, so can we cut to the chase and just talk about why this is not or is or is not a retail outlet? Yes, I would love to. I think Ms. Peru's case comes down to the fact that the common meaning in American English of the phrase retail outlet does not encompass a business like Sharpshooter Spectrums. If there is room for doubt on that, I think the legislative history reveals that Congress used the phrase to the extent we can credit the legislative history, and it's the only hint we have. The passage that relates to retail outlet uses the word store interchangeably with it. I think it's pretty clear that what Congress had in mind was precisely such retail outlets as the stores on San Francisco's Pier 39. So using the nature of the business test? Yes. What about the nature of the duties? Well, if you have a case in which the employer is a multifaceted corporation, as Vermillion Company in the Fifth Circuit's Green case, it's not necessarily unreasonable to say if this company operates a camp, and this is an employee of that corporation who works only at that camp and the performance of the contract to operate the camp, all right, I don't think that's problematic. We can say that person is employed by a camp in only a slightly loose sense. That's very different from saying someone who is employed by a company that does not operate one of these excluded businesses is nevertheless within the exclusion because their duties pertain to an excluded business. You say it's not a retail operation? Well, I say it is not a retail outlet. I think retail operation might be subject to a broad enough construction. Perhaps retail establishment, if Congress had borrowed that phrase. That's what I was going to ask. What is it in your view? I mean, if we're pigeonholing, what is it? I don't think it would be a stretch to say that it is a retail establishment, and that is the phrase that Congress used in the Fair Labor Standards Act. I think there's something to the ALJ's notion or the board's notion, I suppose it is, that retail just means selling to the ultimate consumer. Looking at the definition, it says the term employee means any person engaged in maritime employment, and then it says, but it does not include. So if we were to find that she was employed by a retail outlet, does that mean that she was not engaged in maritime employment? In other words, are those terms mutually exclusive? No, quite the contrary. I think by virtue of the fact that some of her work was performed upon navigable waters, she was engaged in maritime employment. So you would narrow the definition of maritime employment to employees who are at times engaged on navigable waters, period, and not look to the nature of their duties? No. The Supreme Court has addressed maritime employment in a number of decisions, even before these 1984 amendments added the list of exclusions. And even if you only work ashore, if you're in one of the primary maritime industries, cargo handling and shipyard work, even if you never go aboard a vessel afloat on the water, you're engaged in maritime employment. How does a permanent museum play into this? This is a museum, is it not? It is a museum vessel, yes. And it's stationary? Well, no, it's actually not stationary. It is at a temporary berth at Ford Island. How long has it been at the temporary berth? Since 1998. By contract, it was supposed to move within three years, I believe, either two or three years. But the association didn't have the money to make the move, and the Navy has from time to time extended their lease on Pier F5. It's supposed to have a permanent berth, two berths down. And it is contractually, the association is contractually required to maintain her, and that requires moving her to dry dock periodically. As a matter of fact, it's been in the news in the last few weeks, there is the aircraft carrier Intrepid, which was launched the same year as the Missouri, is in New York Harbor, and she needs to move to dry dock, and there's been siltation under. So she's been stationary for 20 years. Sitting on mud now, I guess. Well, her propellers are definitely hung up in a lot of mud. Is there a case in the Ninth Circuit that we can follow that gets us to a result, or do we have to figure out between Greene and Hough and Bezor where we go? I don't think the distinction between Greene, Hough, and Bezor makes any difference. But at the same time, the answer to your first question is no, there is no Ninth Circuit case. I think it was pretty clear all along, at least until very recently, that these museum vessels, injuries aboard museum vessels that were afloat on navigable waters, were within Admiralty Torch jurisdiction. But there has been no Longshore case in this court pertaining to a museum vessel. The Second Circuit's decision in McCarthy against the Bark Pay King, which preceded the 84 Amendments, did confirm that there was Longshore coverage of work on a museum vessel afloat on navigable waters in the United States. But that was, as I say, before these exclusions were enacted, and I think the museum exclusion in this same subsection that we're talking about here would apply to that case if that case came up after 1984. That was an employee of the museum ship, the company that operated the museum ship. But this is different in that Ms. Brood did not work for the company that operates the museum. All right. Well, you are out of time. Thank you very much. I hope I might have a minute for rebuttal with the Court's indulgence. Thank you. Let's see. Good morning. May it please the Court. Mike McConnell on behalf of Respondent Sharpshooter Spectrum Venture, LLC. I think one of the things I want to bring up in response to some of the claimants' arguments is, first of all, this concept of store, that the definition is a retail store rather than a retail outlet. Congress certainly could have inserted the word store instead of outlet had it wanted to. And with regard to the legislative history that counsel is referring to, it refers to store in terms of the fact that workers doing construction on the edifice, the actual store which the operation may be housed in, do not fall within this exclusion. Outlet is an odd word to use. And I'm not sure whether Congress intended it in this way. But in much common usage, outlet is a subset of store. That is to say, a retail outlet or an outlet store tends to be where the seconds go and so on. So it's an odd word to use if the argument is somehow different or more expansive, because I can find usages that are more expansive and less expansive. Right. I agree with Your Honor on that. And that's probably why we're here today. There are usages, as counsel has briefed and as we have briefed, if you look at the dictionary you can find a myriad of different definitions. And what I would argue is that outlet is more expansive. I mean, like I said, Congress could have certainly used store. And they've only used store once in one section of this legislative history. And if you look at the prior sentence that counsel is referring to, they're still talking about a retail outlet. So I would argue for the more expansive version of that. Are there any policy reasons that would push us in one direction or the other on this? Yes, Your Honor. One of the big policy reasons I think the Court should consider here is you'd be very hard-pressed to find any operation that fit precisely into one of these definitions in Section 2.3b. You've got club, camp, restaurant, museum. For instance, Your Honor, I don't think you could go anywhere, at least in this state, to a club, camp, restaurant, and not find an ATM in there. Under claimant's reasoning, you know, there's an ATM. They're not exclusively doing club, restaurant, retail operation. Maybe they're doing banking, so therefore they don't fit in this definition. What claimant's arguing for is a far more narrow interpretation of this exclusion than what was intended. And it just won't work in this day and age where you have operations doing a variety of things. If you look at Bazor Green, you've had operations which were doing something other than just a camp, other than just a casino. And if Ms. Prew has no remedy under this statute, what alternative remedies might she have? State workers' comp, Your Honor. And do we have any history as to what happened with her as to state workers' comp? My understanding, Your Honor, and this came out at the hearing, was that she had applied for the state workers' compensation benefits, and she had also applied for longshore benefits. And although I'm no expert on Hawaii workers' compensation law, my understanding is that the workers' comp office, once they saw that she had applied for longshore benefits, said, well, you're a longshoreman. We're declining your benefits under state workers' comp. And I believe at the hearing, this issue came up, and the administrative law judge recommended to Ms. Prew, she asked Ms. Prew's counsel if the benefits were still available, if the statute had told, and counsel had responded that Ms. Prew could apply for state benefits, and the ALJ recommended that she do so. I do not know what has happened since then, Your Honor. All right. Let's assume, for the sake of argument, that we might agree with you on the retail business. What about the business about employees that should remain covered even so, because of the nature of the work to which they do and the hazards to which they are exposed? What about the duties part of this? Right. In this case, claimant was a photographer. That's not a traditional maritime employment. How do we know that? I mean, we see gazillions of photographs of people on ships, including President Bush and all the rest of them. Further photographs seem to be all over the place. Right. I think you can go back to the definition here, where it talks about the people that are intended to be covered are longshoremen, ship breakers, ship repairers, and those sort of employees. Then we move on to the exclusions. You talk about clerical workers and 9023A office staff, and you move on to retail operations, camps, the exclusion that we're dealing with here. This is clearly a retail operation. Well, has the Supreme Court set forth a definition of what is traditional maritime activity? Yes, they have, Your Honor. I believe traditional maritime activity is activity with, well, in my opinion, it's a gray area, Your Honor. It's activity that, one, has an effect on maritime commerce, which this clearly does not. Well, if she were employed by the ship as the ship's photographer to take photographs of special tours in the captain's room, wouldn't she fall within the maritime duties that we're talking about? If she were employed by the ship as the ship's photographer, would you be able to argue that because she was a photographer that's not a traditional maritime duty? I believe so, Your Honor. I don't think that her job as a photographer has any effect on maritime commerce in this situation. Period, no matter who she's employed by. Correct. I don't think it's going to affect maritime commerce. I mean, the fact that she may be taking photographs of tourists aboard the ship, first of all, the ship itself is not involved in maritime commerce. It's permanently cold iron. Maybe it's supposed to go to a permanent mooring two docks away, but the vessel's a museum for all intents and purposes. It's not engaged in any kind of commerce. Isn't there another part of the definition about subject to the hazards of traditional maritime activity, the hazards of working on navigable waters? Right, Your Honor. Yes, that is part of one of the definitions. In this case, I think what the court should consider, though, is the fact that if you accept Clayman's argument, the fact that this accident happened on navigable waters and, therefore, she should be included, you basically defeat the purpose of these exclusions. So if you're going to just say, well, the accident happened on navigable waters, even though she was working for a retail outlet, you basically do away with the reason for having this retail outlet exclusion. Thank you. And unless the court has any other questions, I don't have much more to add. All right. Thank you very much, counsel. You can have a minute. Thank you. I appreciate the court's indulgence. Let me clarify my answer earlier. The structure of Section 2.3 and its exclusions is that even though one is engaged in maritime employment, within the meaning of that opening clause of Section 2.3, if they're within one of the exclusions, they're not covered by the Act, even though they're engaged in maritime employment. The Supreme Court's decision in the Perrini case establishes that even though, with respect to those who are in the main maritime industries, they're engaged in maritime employment even if they work only ashore. Everyone, even outside, completely outside of those industries, having nothing to do with those industries, if they work on navigable waters, even in part, then they are engaged, at least in that part, in maritime employment. The exclusions tell us even though you are engaged in maritime employment, you're not covered. Thus, the gift shop aboard a museum vessel, for example, if they sell T-shirts, souvenirs, that would appear to me to be within the plain meaning of a retail outlet. In a gift shop, including, for example, on a ship that's unavoidably, inescapably engaged in maritime commerce, so a cruise ship ties up here for a couple of days, goes out on a cruise and so on, the gift shop within that cruise ship is also excluded. Well, in fact, I think that person would certainly be excluded by Section 2.3g as a member of the crew of any vessel. The Supreme Court has taken a broad view of what it means to be a crew member. If it's an operating vessel in that sense, It's excluded in any event? That's right. Those people are going to be covered by the Jones Act in general maritime employment. The only other point that I wanted to make is that the injury to Ms. Beru did occur as a result of a distinctly maritime hazard. It was a ship's ladder that she was ascending, not an ordinary stairway. This is a ship's ladder on a battleship, and she had armloads of photographic equipment and went up the ladder and hit her head. When you go up a ship's ladder, it's not open at the top like a stairway in a store. It's a hatch that you have to go up through, a deck hatch, which has a lid that you can pop down on. Well, the lid's open, but you still have a narrow space to go up through. That's why she whacked her head on the overhead ceiling as she went up there. Can you shed some light on her other remedies, such as statework, Ms. Cohn? I think Mr. Nakano has given you an accurate account. There was a state claim filed, and the state administrative authorities said, Have you filed a Longshore Act claim? You're covered by that. We're not touching it. Just on the basis of filing it, I mean, not on the basis of the merits, whether the state remedies apply versus the Longshore Act. So far, that is true. But is that like an abstention, for example, if you were to lose this case, that you're alive again in state work, Ms. Cohn? It may be, yes. That is a possibility. I'm not qualified to comment on the state comp law procedures that would allow her to reopen that or not. It may be too late, or it may be possible. I hope we don't have to go there. Thank you very much. All right. Thank you very much, counsel. Peru v. Sharpshooter Spectrum Gunship will be submitted.
judges: Trott, Wardlaw, W. Fletcher